**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------- x

**PENGUIN GROUP (USA) INC.,**                                           :

                        Plaintiff,                :

                                   **No. 09cv528 (JGK)**

       -against-                                          :

                                   **ECF CASE**

**AMERICAN BUDDHA**,                                                    :

                        Defendant.                :

------------------------------------------------------------------------- x

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S**
**MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

Richard Dannay (rxd@cll.com)
Thomas Kjellberg (txk@cll.com)
COWAN, LIEBOWITZ & LATMAN, P.C.
1133 Avenue of the Americas
New York, NY  10036
Phone: 212-790-9200
Fax: 212-575-0671
Attorneys for Plaintiff

## TABLE OF CONTENTS

INTRODUCTORY STATEMENT ................................................................................ 1

I.  The Parties ........................................................................................................ 2

II. Background ........................................................................................................ 2

ARGUMENT ............................................................................................................... 8

I.  THE REMAINING REQUIREMENTS OF CPLR § 302(a)(3)(ii) ARE MET ................ 8

    A.  American Buddha Should Reasonably Have Expected its Acts to Have Consequences in New York ........................................................................ 9

    B.  American Buddha Has Derived Substantial Revenue From Interstate or International Commerce ............................................................................. 11

II. THIS COURT'S EXERCISE OF JURISDICTION WILL NOT VIOLATE AMERICAN BUDDHA'S DUE PROCESS RIGHTS .................................................................. 16

    A.  The Minimum Contacts Requirement is Met by American Buddha's Intentional Conduct, Which Was Expressly Aimed at and Caused Harm to Penguin in New York ...................................................................................................... 16

        1.  The Interactive AB Websites Support a Finding of Jurisdiction Over American Buddha ........................................................................ 20

    B.  The Exercise of Jurisdiction Over American Buddha Is Reasonable .................. 22

CONCLUSION ........................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*ADP Investor Commun. Servs. v. In House Atty. Servs.*, 390 F. Supp. 2d 212 (E.D.N.Y. 2005) .................................................................................................. 15

*Allen v. Canadian General Electric Co.*, 65 A.D.2d 39, 410 N.Y.S.2d 707 (3d Dep't 1978) ........................................................................................................ 11

*Alpha Int'l, Inc. v. T-Reproductions, Inc.*, 2003 U.S. Dist. LEXIS 11224 (S.D.N.Y. July 1, 2003) ...................................................................................... 20

*Armco Inc. v. North Atl. Ins. Co.*, 68 F. Supp. 2d 330 (S.D.N.Y. 1999) ....................................... 8

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985).................................................... 16, 17, 22

*Calder v. Jones*, 465 U.S. 783 (1984)........................................................................... 16, 17, 22

*Capitol Records v. VideoEgg*, 2009 U.S. Dist. LEXIS 19557 (S.D.N.Y. Mar. 9, 2009)......................................................................................................... 11, 23, 24

*Cello Holdings, L.L.C. v. Lawrence-Dahl Cos.*, 89 F. Supp. 2d 464 (S.D.N.Y. 2000).................................................................................................................... 15

*Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549 (S.D.N.Y. 2000)................................. 20

*Columbia Pictures Television v. Krypton Broad. of Birmingham, Inc.*, 106 F.3d 284 (9th Cir. 1997)................................................................................................ 17

*eBay Inc. v MercExchange, L.L.C.*, 547 U.S. 388 (2006)........................................................... 7

*Energy Brands Inc. v. Spiritual Brands, Inc.*, 571 F. Supp. 2d 458 (S.D.N.Y. 2008)........................................................................................................... 11, 15, 25

*Fantis Foods, Inc. v. Standard Importing Co.*, 49 N.Y.2d 317, 425 N.Y.S.2d 783 (1980) ............................................................................................................. 9

*Gianino v. Panacya, Inc.*, 2000 U.S. Dist. LEXIS 12338 (S.D.N.Y. Aug. 21, 2000)................................................................................................................... 8

*Gucci Am., Inc. v. Frontline Processing Corp.*, 721 F. Supp. 2d 228 (S.D.N.Y. 2010)................................................................................................................... 12

*Hanson v. Denckla*, 357 U.S. 235 (1958) ............................................................................ 18

*Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539 (1985) ...................... 21

*Hollow v. Hollow*, 193 Misc. 2d 691, 747 N.Y.S.2d 704 (Sup. Ct. Oswego County 2002)................................................................................................................. 23

*Hsin Ten Enter. USA, Inc. v. Clark Enters.*, 138 F. Supp. 2d 449 (S.D.N.Y. 2000) .................. 20

*In re Magnetic Audiotape Antitrust Litigation*, 334 F.3d 204 (2d Cir. 2003) .............................. 8

*Ingraham v. Carroll*, 90 N.Y.2d 592, 665 N.Y.S.2d 10 (1997) .................................................. 11

ii

*Isbell v. DM Records, Inc.*, 2004 U.S. Dist. LEXIS 10394 (N.D. Tex. June 4, 2004) ............................................................................................................. 17

*J. McIntyre Machinery, Ltd. v. Nicastro*, 131 S. Ct. 2780 (2011) ......................... 18, 20

*Janmark Inc. v. Reidy*, 132 F.3d 1200, (7th Cir. 1997) ................................... 17

*John Wiley & Sons, Inc. v. Treeakarabenjakul*, 2009 U.S. Dist. LEXIS 52819 (S.D.N.Y. June 17, 2009) .................................................................................. 8

*Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984) ....................................... 16

*Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236 (2d Cir. 1999) .......................... 9, 24

*LaMarca v. Pak-Mor Mfg. Co.*, 95 N.Y.2d 210, 713 N.Y.S.2d 304 (N.Y. 2000) ............. 9, 10, 12

*M. Shanken Comm'ns. Inc. v. Cigar 500.com*, 2008 U.S. Dist. LEXIS 51997 (S.D.N.Y. July 7, 2008) ...................................................................................... 23

*Mario Valente Collezioni, Ltd. v. Confezioni Semeraro Paolo, S.R.L.*, 264 F.3d 32 (2d Cir. 2001) ...................................................................................................... 16

*Marks v. United States*, 430 U.S. 188 (1977) ............................................... 18

*McGowan v. Smith*, 52 N.Y.2d 268 (1981) .................................................. 11

*McGraw-Hill Cos. v. Ingenium Techs. Corp.*, 375 F. Supp. 2d 252 (S.D.N.Y. 2005) ................................................................................................................. 10

*Mega Tech Int'l Corp. v. Al-Saghyir Establishment*, 1999 U.S. Dist. LEXIS 6381 (S.D.N.Y. May 3, 1999) ..................................................................................... 23

*Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560 (2d Cir. 1996) ........ 23

*Mfg. Tech., Inc. v. Kroger Co.*, 2006 U.S. Dist. LEXIS 90393 (S.D.N.Y. 2006) ........ 10, 15

*Milliken v. Meyer*, 311 U.S. 457 (1940) ...................................................... 22

*Obabueki v. Int'l Bus. Machines Corp.*, 2001 WL 921172 (S.D.N.Y. Aug. 14, 2001) ................................................................................................................. 20

*Panavision Intern., L.P. v. Toeppen*, 141 F.3d 1316 (9th Cir. 1998) ....................... 18

*Penguin Group (USA) Inc. v. Am. Buddha*, 16 N.Y.3d 295 (2011) ...................... passim

*Penguin Group (USA) Inc. v. Am. Buddha*, 2009 U.S. Dist. LEXIS 34032 (S.D.N.Y. Apr. 21, 2009) ............................................................................ 5, 14

*Penguin Group (USA) Inc. v. Am. Buddha*, 609 F.3d 30 (2d Cir. 2010) .............. 5, 6

*Penguin Group (USA) Inc. v. Am. Buddha*, 640 F.3d 497 (2d Cir. 2011) ............... 8

*Pilates, Inc. v. Pilates Inst.*, 891 F. Supp. 175 (S.D.N.Y. 1995) ......................... 8

*Prentice v. Demag Material Handling, Ltd.*, 80 A.D.2d 741, 437 N.Y.S.2d 173 (4th Dep't 1981) .................................................................................................. 15

*Real Good Toys v. XL Machine Ltd.*, 163 F. Supp. 2d 421 (D. Vt. 2001) ................. 18

*Righthaven, LLC v. Mostofi*, 2011 U.S. Dist. LEXIS 35950 (D. Nev. Mar. 22, 2011) ................................................................................................................. 18

iii

*Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010) .................................................................. 8

*Savage Universal Corp. v. Grazier Constr.*, 2004 U.S. Dist. LEXIS 16088
    (S.D.N.Y. Aug. 13, 2004) ................................................................. 12, 22, 24

*Simon v. Philip Morris, Inc.*, 86 F. Supp. 2d 95 (E.D.N.Y. 2000) ................................. 17

*Sony BMG Music Entm't v. Tenenbaum*, 672 F. Supp. 2d 217 (D. Mass. 2009) .................. 21, 22

*Sony BMG Music Entm't v. Tenenbaum*, 721 F. Supp. 2d 85 (D. Mass. 2010) .......................... 22

*Starmedia Network, Inc. v. Star Media, Inc.*, 2001 U.S. Dist. LEXIS 4870
    (S.D.N.Y. Apr. 23, 2001) ................................................................. 10, 22

*Sybron Corp. v. Wetzel*, 46 N.Y.2d 197 (1978) ................................................................. 10

*Vecchio v. S & T Manufacturing Co.*, 601 F. Supp. 55 (E.D.N.Y. 1984) ....................................... 11

*Whitaker v. Fresno Telsat, Inc.*, 87 F. Supp. 2d 227 (S.D.N.Y. 1999) ......................................... 23

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980) ................................. 16, 24

## Statutes

17 U.S.C. § 106 ................................................................................................................. 1

17 U.S.C. § 107 ................................................................................................................. 3

17 U.S.C. § 108 ................................................................................................................. 3, 4

17 U.S.C. § 512 ................................................................................................................. 2, 3, 4

## Rules

CPLR § 302(a)(3)(ii) ................................................................................................ passim

Fed. R. Civ. P. 12(b)(2) .................................................................................................... 1, 8

## Legislative History

H.R. Rep. No. 105-551, 105th Cong., 2d Sess. (1998) ................................................. 6

S. Rep. No. 105-190, 105th Cong., 2d Sess. (1998) ..................................................... 3

Twelfth Ann. Report of N.Y. Judicial Conference (1967) .............................................. 9

## Other Authorities

Julie E. Cohen *et al.*, *Copyright in a Global Information Economy* (2d ed. 2006) ...................... 24

iv

Plaintiff Penguin Group (USA) Inc. ("Penguin") submits this memorandum of law in opposition to American Buddha's second motion to dismiss this action for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2).  American Buddha's motion should be denied.[1]

## INTRODUCTORY STATEMENT

Is this case all about, really, the modern world of Internet access … is it different than the old days? … The Internet is integral to the modern age of piracy; integral to … what we're talking about, right?  So how does this all fit into the envelope of long-arm jurisdiction in this modern, different world that we live in?

Lippman, CJ, Oral Argument in *Penguin Group (USA) Inc. v. American Buddha*, Feb. 9, 2011, *available at* www.courts.state.ny.us/CTAPPS/arguments/2011/Feb11/Feb11_OA.htm.

This suit arose out of American Buddha's electronic copying and uploading to the Internet of digital e-book copies of four Penguin books, in violation of Penguin's exclusive right to reproduce, display and distribute the books under Section 106 of the Copyright Act, 17 U.S.C. § 106.  American Buddha displays and distributes its unauthorized copies, as "ABOL Deep-Linked Versions," on the "AB Websites," www.naderlibrary.com and www.american-buddha.com.  *See* Exh. 1.[2]  To induce the reading and downloading of the unauthorized e-books, "American Buddha's Web sites assure its users that its uploading of these works and the users' downloading of them do not constitute copyright infringement because they are protected under sections 107 and 108 of the Copyright Act."  *Penguin Group (USA) Inc. v. Am. Buddha*, 16 N.Y.3d 295, 299 (2011); *see* Exh. 2.

Penguin's *prima facie* case of copyright infringement is effectively undisputed. American Buddha has never denied its unauthorized reproduction, display and distribution of the

---

[1] Alternatively, if in the Court's view Penguin has not sufficiently pled jurisdictional facts, Penguin respectfully requests that it be granted limited jurisdictional discovery or leave to amend the complaint, as the Court deems appropriate.

[2] Exhibit citations reference exhibits to the Declaration of Thomas Kjellberg submitted herewith.

Penguin books.  Instead, it has asserted the affirmative defenses of fair use under Section 107 of the Copyright Act, and the "library privilege" under Section 108.

## I.      The Parties

Penguin Group (USA) Inc. is the U.S. arm of the internationally renowned Penguin Group, a leading United States trade book publisher and the second-largest English-language trade book publisher in the world, with its principal place of business at 375 Hudson Street, New York, New York 10014.  American Buddha is an Oregon not-for-profit corporation with its principal place of business at 2165 South Avenida Planeta, Tucson, Arizona 85710.

## II.     Background

In December 2008 and January 2009 Penguin learned that American Buddha had electronically copied four Penguin books—*Oil!* by Upton Sinclair; *It Can't Happen Here* by Sinclair Lewis; the E. J. Kenney translation of *The Golden Ass* by Apuleius; and the R. E. Latham translation of *On the Nature of the Universe* by Lucretius—and uploaded the copies, including the Penguin cover art, for viewing and downloading on the AB Websites.  On December 18, 2008 Penguin's counsel wrote to Mr. Carreon at the email address hot-linked on the Naderlibrary.com site as "Legal Representation for American Buddha," requesting that the first unlawful e-book Penguin discovered be removed from the site.  Exh. 3.  American Buddha responded by "snail mail," enclosing printouts from the Copyright Office online database and "request[ing] that you clarify your standing as counsel."  Exh. 4.  Penguin in turn "request[ed] your client's prompt compliance so that legal action may be avoided," Exh 5; whereupon American Buddha, representing itself to be "an OSP" (online service provider under the Copyright Act), "invite[d]" Penguin "to serve a notice on American Buddha's designated agent for service of DMCA notices," to which "American Buddha will respond with a prompt takedown."  Exh. 6.  *See* 17 U.S.C. § 512(c), (g).

Penguin served American Buddha with the invited Notice of Claimed Infringement, Exh.

2

7, and the infringing e-book was removed from the Naderlibrary.com website. Several days

later, however, American Buddha submitted (to itself, as "OSP") a "counter-notification"

pursuant to 17 U.S.C. § 512(g)(3), stating that American Buddha

> has a good faith belief that the material was removed due mistaken misapplication [*sic*] of the applicable law of copyright, including without limitation: Penguin Books' refusal to accord the American Buddha Online Library the exemption from liability granted by 17 U.S.C. § 108 and the First Amendment, notwithstanding the subscriber's compliance with 37 C.F.R. 201.14; the Constitutional right of fair use under 17 U.S.C. § 107; the first-sale doctrine; and, because of mistakes of fact.

Exh. 8. Penguin informed American Buddha that its claim that an online library is entitled to the

Section 108 "library exemption" is baseless, as the Senate Report accompanying the Digital

Millennium Copyright Act (DMCA) "made clear":

> [T]he Committee wants to make clear that, just as when section 108 of the Copyright Act was first enacted, the term "libraries" and "archives" as used and described in this provision still refer to such institutions only in the conventional sense of entities that are established as, and conduct their operations through, physical premises in which collections of information may be used by researchers and other members of the public. Although online interactive digital networks have since given birth to online digital "libraries" and "archives" … <u>it is not the Committee's intent that section 108 as revised apply to such collections of information.</u>

S. Rep. No. 105-190, 105th Cong., 2d Sess. 62 (1998) (emph. added). The Committee

anticipated the precise scenario presented by the AB Websites:

> The ease with which such sites are established online literally allows anyone to create his or her own digital "library" or "archives." The extension of the application of section 108 to all such sites would be tantamount to creating an exception to the exclusive rights of copyright holders that would permit any person who has an online website, bulletin board or a homepage to freely reproduce and distribute copyrighted works. <u>Such an exemption would swallow the general rule and severely impair the copyright owners' right and ability to commercially exploit their copyrighted works.</u> Consequently, the Committee intends that references to "the premises of the library or archives" in amended sections 108(b)(2) and (c)(2) mean only physical premises.

*Id*. (emph. added). *See* Exh 5. In the two and one-half years since it first claimed entitlement to

the library exemption, American Buddha has never attempted to square its claim, legally or

3

factually, with the unambiguous language of the Senate Report, or the statute itself.[3]

When a DMCA counter-notice is submitted the OSP, to avoid liability to the user for removing the material, must "replace the removed material and cease[] disabling access to it not less than 10, nor more than 14, business days following receipt of the counter notice." 17 U.S.C. § 512(g)(1). The OSP may, however, refrain from replacing the material, and remain exempt from liability to the user, if the OSP receives notice within the 10-to-14 business day period that the person who submitted the original notice "has filed an action seeking a court order to restrain the subscriber from engaging in infringing activity relating to the material on the service provider's system or network." 17 U.S.C. § 512(g)(1)-(2). Thus, when American Buddha submitted its counter-notice Penguin was required, based on American Buddha's own actions and representations, to file suit within 14 business days to prevent the re-posting of the Penguin e-books online. Penguin, accordingly, filed the present suit—and American Buddha promptly replaced the pirated Penguin e-books on the AB Websites.

On March 9, 2009, American Buddha moved to dismiss the complaint for lack of personal jurisdiction, arguing that its ties to New York were too insubstantial. Penguin asserted in response that long-arm jurisdiction over American Buddha was proper under CPLR § 302(a)(3)(ii), which provides that a court may exercise personal jurisdiction over any non-domiciliary who, in person or through an agent, "commits a tortious act without the state causing injury to person or property within the state …, if he … expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce."

As described by the New York Court of Appeals, this Court (Lynch, J.)

---

[3] The statute requires that any copy of a work that a library or archive makes in a digital format "not [be] made available to the public in that format outside the premises of the library or archives." 17 U.S.C. § 108 (b)(2), (c)(2).

4

granted American Buddha's motion and dismissed the complaint, holding that Penguin was injured in Oregon or Arizona, where the copying and uploading of the books took place.  The court determined that Penguin suffered only a "purely derivative economic injury" in New York based on its domicile here, which was insufficient to trigger CPLR 302(a)(3)(ii).  Although the court acknowledged that the Internet could be a complicating factor in analyzing personal jurisdiction, it concluded that the Internet played "no role in determining the situs of [Penguin's] alleged injury" since the claimed infringement occurred in Oregon or Arizona.

*Penguin Group (USA) Inc. v. Am. Buddha*, 16 N.Y.3d 295, 300-301 (2011).  Judge Lynch recognized that there had been "significant disagreement within this district regarding the situs of injury in intellectual property cases, with some cases finding 'that the torts of copyright infringement and trademark infringement cause injury in the state where the allegedly infringed intellectual property is held ….'"  *Penguin Group (USA) Inc. v. Am. Buddha*, 2009 U.S. Dist. LEXIS 34032, *8-9 (S.D.N.Y. Apr. 21, 2009).  In this case, however, the Court "f[ound] more compelling the reasoning of the competing line of cases" finding that infringing acts committed outside New York cause injury only in the physical locale in which the acts were committed.  *Id.* at *9.  Judge Lynch found that American Buddha's conduct—making digital copies of Penguin's books; uploading them to the AB Websites; and inducing unlimited reading, and downloading of further copies, with assurances that such acts are lawful—was the same as "if defendant had made an unauthorized photocopy of a copyrighted book in Oregon or Arizona" in its ability to injure authors or copyrights in New York.  *Id.* at *12-13.

Penguin appealed the dismissal to the Second Circuit Court of Appeals.  The Second Circuit concluded that determining the "situs of injury" in a copyright case for the purposes of CPLR § 302(a)(3) required analysis of New York state law and policy considerations that the Court deemed itself ill-suited to make, *Penguin Group (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 32 (2d Cir. 2010), and that "deciding which approach better comports with the intent of the New York Legislature is more appropriate for the New York Court of Appeals than it is for us," *id.* at 38.  The Second Circuit certified the following question to the New York Court of Appeals:

5

> In copyright infringement cases, is the situs of injury for purposes of determining long-arm jurisdiction under N.Y. C.P.L.R. § 302(a)(3)(ii) the location of the infringing action or the residence or location of the principal place of business of the copyright holder?

609 F.3d at 32.  The Second Circuit invited the Court of Appeals to "alter this question as it should deem appropriate," *id*. at 42, and noted that "the allegation of distribution over the Internet may be a factor in the Court's interpretation of the statute in question," *id*. at 39.

> It was:

> it is clear that the Internet itself plays an important role in the jurisdictional analysis in the specific context of this case.  It is widely recognized that "the digital environment poses a unique threat to the rights of copyright owners" and that "digital technology enables pirates to reproduce and distribute perfect copies of works—at virtually no cost at all to the pirate."  Indeed, the rate of e-book piracy has risen in conjunction with the increasing popularity of electronic book devices.

*Penguin Group (USA) Inc. v. Am. Buddha*, 16 N.Y.3d 295, 304 (2011) (quoting H.R. Rep. No. 105-551, 105th Cong., 2d Sess. 25 (1998)).  The Court explicitly rejected the notion that the Internet "plays no role," reasoning that it is "illogical" to extend concepts that "may make sense in traditional commercial tort cases" "to online copyright infringement cases where the place of uploading is inconsequential."  *Id*. at 305.  "Because the Internet plays a significant role in this case," the Court narrowed and reformulated the certified question to read:

> In copyright infringement cases involving the uploading of a copyrighted printed literary work onto the Internet, is the situs of injury for purposes of determining long-arm jurisdiction under N.Y. C.P.L.R. § 302(a)(3)(ii) the location of the infringing action or the residence or location of the principal place of business of the copyright holder?

16 N.Y.3d at 301.  The Court concluded unanimously that "under the circumstances of this case … it is the location of the copyright holder."  *Id*.  Its holding was based on "[t]he concurrence of … two elements—the function and nature of the Internet and the diverse ownership rights enjoyed by copyright holders situated in New York."  *Id*. at 306-07.  The Court held that

> The crux of Penguin's copyright infringement claim is not merely the unlawful electronic copying or uploading of the four copyrighted books.  Rather, it is the intended consequence of those activities—the instantaneous availability of those copyrighted

6

works on American Buddha's Web sites for anyone, in New York or elsewhere, with an Internet connection to read  and download the books free of charge.

16 N.Y.3d at 304 (emph. added); *see* Exh. 9.  "[T]he role of the Internet in cases alleging the uploading of copyrighted books distinguishes them from traditional commercial tort cases," *id*. at 306, in which the injury may reasonably be confined to "lost business," and the situs of the injury confined to the physical locations in which business has been lost.  Online infringement

> is dispersed throughout the country and perhaps the world.  In cases of this nature, identifying the situs of injury is not as simple as turning to "the place where plaintiff lost business" because there is no singular location that fits that description.

*Id*. at 305 (citation omitted).  Thus, "[t]he location of the infringement in online cases is of little import inasmuch as <u>the primary aim of the infringer is to make the works available to anyone with access to an Internet connection, including computer users in New York</u>."  *Id*. at 306 (emph. added).  *See* Motoko Rich, *Print Books Are Target of Pirates on the Web*, New York Times, May 12, 2009, Exh. 9.  Moreover, "the absence of any evidence of the actual downloading of Penguin's four works by users in New York is not fatal to a finding that the alleged injury occurred in New York."  *Id*.  Indeed, under the Court's precedents,

> a tort committed outside the state that was likely to cause harm through the loss of business inside the state was sufficient to establish personal jurisdiction regardless of whether damages were likely recoverable or even ascertainable.

*Id*. (citations omitted).  *See* Kjellberg Decl. ¶¶ 15-22.  A New York copyright holder whose copyright is infringed suffers more than indirect financial loss, including, fundamentally, harm to the copyright holder's "overarching 'right to exclude others from using his property.'"  *Id*. at 305 (quoting *eBay Inc. v MercExchange, L.L.C.*, 547 U.S. 388, 392 (2006)):

> [O]ne of the harms arising from copyright infringement is the loss or diminishment of the incentive to publish or write.  Publishers obviously need economic incentives to publish scholarly works … If publishers cannot look forward to receiving permission fees, why should they continue publishing marginally profitable books at all?  And how will artistic creativity be stimulated if the diminution of economic incentives for publishers to publish academic works means that fewer academic works will be published?"  And, the harm to

7

> a plaintiff's property interest in copyright infringement cases has often been characterized as irreparable in light of possible market confusion.

*Id*. at 306 (internal quotations omitted).  As the Court of Appeals noted, "Courts often issue injunctive relief in copyright infringement cases to halt impermissible uses because 'to prove the loss of sales due to infringement is … notoriously difficult.'"  *Id*. (quoting *Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010)).

On May 12, 2011 the Second Circuit issued a *per curiam* opinion vacating the judgment dismissing the complaint, and remanding for further proceedings.  *Penguin Group (USA) Inc. v. Am. Buddha*, 640 F.3d 497 (2d Cir. 2011).

## ARGUMENT

On a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), the plaintiff bears the burden to establish the court's jurisdiction.  *In re Magnetic Audiotape Antitrust Litigation*, 334 F.3d 204, 206 (2d Cir. 2003).  However, "where, as here, the defendant challenges only the legal sufficiency of the plaintiff's factual allegation by filing a Rule 12(b) motion, a plaintiff's obligation generally is easiest to fulfill, for it need persuade the court only that its factual allegations constitute a *prima facie* showing of jurisdiction."  *Pilates, Inc. v. Pilates Inst.*, 891 F. Supp. 175, 178 (S.D.N.Y. 1995).  On a 12(b)(2) motion, all pleadings and affidavits "are to be construed liberally for the benefit of the plaintiffs," *John Wiley & Sons, Inc. v. Treeakarabenjakul*, 2009 U.S. Dist. LEXIS 52819, *7 (S.D.N.Y. June 17, 2009), with "all doubts resolved in plaintiffs' favor." *Armco Inc. v. North Atl. Ins. Co.*, 68 F. Supp. 2d 330, 335 (S.D.N.Y. 1999).  "Thus, plaintiff at th[is] stage of the litigation satisfies his burden even when the moving party makes contrary allegations that place in dispute the factual basis of plaintiff's *prima facie* claim."  *Gianino v. Panacya, Inc.*, 2000 U.S. Dist. LEXIS 12338, *10-11 (S.D.N.Y. Aug. 21, 2000).

## I.      THE REMAINING REQUIREMENTS OF CPLR § 302(a)(3)(ii) ARE MET

In order to establish jurisdiction under CPLR § 302(a)(3)(ii), the plaintiff must show that

8

(1) the defendant committed a tortious act outside the state; (2) the cause of action arose from that act; (3) the act caused injury to a person or property within the state; (4) the defendant expected or should reasonably have expected the act to have consequences in the state; and (5) the defendant derives substantial revenue from interstate or international commerce. *LaMarca v. Pak-Mor Mfg. Co.*, 95 N.Y.2d 210, 214, 713 N.Y.S.2d 304 (N.Y. 2000). Here only the fourth and fifth elements are at issue.

### A.     American Buddha Should Reasonably Have Expected its Acts to Have Consequences in New York

"The test of whether a defendant expects or should reasonably expect his act to have consequences within the State is an objective rather than subjective one." *Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 241 (2d Cir. 1999). The "foreseeability" requirement "'relates to forum consequences generally and not to the specific event which produced injury within the state.'" *Fantis Foods, Inc. v. Standard Importing Co.*, 49 N.Y.2d 317, 326 n.4 (1980) (quoting Twelfth Ann. Report of N.Y. Judicial Conference 344 (1967)). Penguin's New York City address appears on the copyright page of each of the Penguin books American Buddha pirated. The Penguin editions of *Oil!* and *It Can't Happen Here* contain in addition the following legend:

> The scanning, uploading and distribution of this book via the Internet or via any other means without the permission of the publisher is illegal and punishable by law. Please purchase only authorized electronic editions, and do not participate in or encourage electronic piracy of copyrighted materials. Your support of the author's rights is appreciated.

*See* Exh. 10; and *see supra* § II (outlining American Buddha's prelitigation correspondence with Penguin's counsel in New York). American Buddha cannot reasonably have failed to foresee that its copying and uploading of Penguin's books would cause injury in New York.[4] *See*

---

[4] The scanning, uploading, display and distribution of the Penguin books was knowing and intentional, performed for American Buddha its President and "full-time archivist and librarian," who has "a degree in Sociology with a minor in Anthropology from Southern Oregon University, from which [she] graduated in 1983 Summa Cum Laude," and is "currently studying to take the

*(footnote continued on following page)*

9

*LaMarca*, 95 N.Y.2d at 215 (reference to New York in defendant's invoice showed that defendant had reason to foresee that equipment defects would have consequences in New York); *Mfg. Tech., Inc. v. Kroger Co.*, 2006 U.S. Dist. LEXIS 90393,*6-7 (S.D.N.Y. 2006) (emails showing plaintiff's New York address made out *prima facie* showing that defendants should reasonably have expected their actions to have consequences in New York). Federal and state courts have repeatedly held it to be "reasonably foreseeable that the provision of materials that infringe the copyrights and trademarks of a New York company will have consequences in New York." *McGraw-Hill Cos. v. Ingenium Techs. Corp.*, 375 F. Supp. 2d 252, 256 (S.D.N.Y. 2005); *see*, *e.g.*, *Starmedia Network, Inc. v. Star Media, Inc.*, 2001 U.S. Dist. LEXIS 4870 (S.D.N.Y. Apr. 23, 2001) ("the defendant knew or should have known of plaintiff's place of business, and should have anticipated being haled into New York's courts to answer for the harm to a New York plaintiff."); *Sybron Corp. v. Wetzel*, 46 N.Y.2d 197, 206 (1978) (harm within New York from out-of-state trade secret misappropriation and unfair competition was foreseeable). American Buddha's actual or constructive knowledge that Penguin has its principal place of business, and holds its copyrights, in New York made it reasonably foreseeable by American Buddha that its intentional conduct would have consequences in New York.[5]

---

GRE and in preparation to apply to the University of Arizona for the Masters in Library Science program." Tara Carreon Decl. (Dkt. No. 28) ¶¶ 2, 3, 6. Knowledge that Penguin is located in New York may reasonably be imputed to American Buddha through its full-time archivist and librarian.

[5] American Buddha's President's recitation that "I have never had any reason to anticipate that the AB Websites would cause an effect in New York," Tara Carreon Decl. ¶ 14, is immaterial and plainly wrong, premised as it is on the assumptions (1) that an electronic book "is not a book," because it "requires a computer to read," and (2) that no rational person would use the electronic copies she uploaded to the AB Websites to make print copies of the pirated Penguin books. *Id.* ¶¶ 18-20. The notion that the foreseeable consequences of online book piracy are limited to, or even include, readers printing out and binding hard copies is so off-base as to appear disingenuous—particularly coming from American Buddha, the publisher of numerous e-books offered for paid download on Amazon.com. *See* Kjellberg Decl. ¶¶ 23-28. The pirated e-books on the AB Websites can be read in lieu of genuine Penguin books using any e-book reader, laptop or PC that has a Web browser, with no need to download the files, much

*(footnote continued on following page)*

**B.      American Buddha Has Derived Substantial Revenue From Interstate or International Commerce**

The substantial-revenue element "requires no direct contact with New York State."

*Ingraham v. Carroll*, 90 N.Y.2d 592, 598 (1997) (citation omitted).  There is no specific dollar

threshold at which revenue becomes "substantial" for purposes of CPLR 302(a)(3)(ii).  Courts

have looked to either the percentage of a party's overall revenue derived from interstate

commerce, or to the absolute amount of revenue generated by a party's activities in interstate

commerce.  *See Vecchio v. S & T Manufacturing Co.*, 601 F. Supp. 55, 57 (E.D.N.Y. 1984);

*Allen v. Canadian General Electric Co.*, 65 A.D.2d 39, 410 N.Y.S.2d 707, 708-09 (3d Dep't

1978).  Neither approach is mandatory, however, and "the main concern is the overall nature of

the defendant's business and the extent to which he can fairly be expected to defend lawsuits in

foreign forums."  *Energy Brands Inc. v. Spiritual Brands, Inc.*, 571 F. Supp. 2d 458, 468

(S.D.N.Y. 2008); *see McGowan v. Smith*, 52 N.Y.2d 268, 273 (1981) (characterizing required

showing not in absolute or relative quantitative terms, but rather as showing that defendant has

"an active interest in interstate or international commerce.").  Thus, "each case must be decided

on its own facts," *Chunky Corp. v. Blumenthal Brothers Chocolate Co.*, 299 F. Supp. 110, 115

(S.D.N.Y. 1969)—including, in the present case, the all-important fact of digital piracy via the

Internet.

Accordingly, the substantial-revenue element has never been applied as an across-the-

board "bigness requirement," as American Buddha argues.  Def. Mem. 8.  In the circumstances

---

less print hard copies.  *See* Kjellberg Decl. ¶¶ 21-22, Exhs. 20, 21.   The "effect in New York"
that American Buddha reasonably should have foreseen includes all of threatened harm,
including irreparable harm, caused by its intentional conduct.  *See American Buddha*, 16 N.Y.3d
295 at 305 (effects, and harm, include violation of copyright holder's "overarching right to
exclude others from using his property"); *Capitol Records, LLC v. VideoEgg, Inc.*, 611 F. Supp.
2d 349, 363 (S.D.N.Y. 2009) ("reasonable expectation" element "requires that a defendant
foresee that its tortious act will have *some* consequences in New York, although not necessarily
the exact consequences that occurred." (emph. in orig.)).

11

of this case, under which "digital technology enables pirates to reproduce and distribute perfect copies of works—at virtually no cost at all to the pirate," *American Buddha*, 16 N.Y.3d at 304 (emph. added), a *per se* "bigness requirement" is as outmoded and unhelpful to the jurisdictional inquiry as "turning to 'the place where plaintiff lost business,'" *id*. at 305.

The substantial-revenue element at bottom "is intended to avoid the exercise of personal jurisdiction over non-domiciliaries whose activities are of a 'local character.'" *LaMarca*, 95 N.Y.2d at 215; *see Gucci Am., Inc. v. Frontline Processing Corp.*, 721 F. Supp. 2d 228, 242 (S.D.N.Y. 2010). American Buddha's activities clearly are not of a local character. Quite the contrary; they include sending spam email to an undisclosed number of recipients including Penguin's counsel in New York, promoting a new book ("Click here to buy it on Amazon") and "inviting" all "Friends of American Buddha" to "Enjoy Your Online Library at Two Locations," to "come visit," and to "spread the word." *See* Kjellberg Decl. ¶¶ 29-31, Exh. 26. The American-buddha.com site characterizes itself as "the world's best media website." *See* Exh. 29. The Naderlibrary.com site provides, and touts, "Online Library Access for All," the activity at the root of this action. *See* Exh. 31. Thus, "[a]lthough [defendant] claims that his businesses are purely local …, even a cursory review of his business websites indicates otherwise." *Savage Universal Corp. v. Grazier Constr.*, 2004 U.S. Dist. LEXIS 16088, *31 (S.D.N.Y. Aug. 13, 2004).

The AB Websites also feature documents pertaining to what Mr. Carreon characterized as "a serious legal dispute that has arisen between [American Buddha] and Google Inc." In an April 13, 2007 letter to Kent Walker, Esq., Google's General Counsel, American Buddha complained that its website "has been purged from the Google index of websites, and thus Google results never display direct links to the Library Site." *See* Exh. 28. The letter shows that American Buddha's "membership" and its activities, as well as its ambitions, take the AB Websites well beyond the "local operation" with "passive websites" American Buddha now claims to be:

12

American Buddha has operated the American Buddha Online Library on the Internet at www.american-buddha.com, since year 2000 ("the Library Site").  During the last six years, the Library Site has built up a membership of over 50,000 users, and its pages have steadily climbed in "Page Rank" under the Google PR system, until with respect to many search categories, the Library Site would appear on the first page of search results for searches involving major topics of political, artistic, philosophical, and cinematic importance.

*Id*.  American Buddha complains that the removal of American-buddha.com from the Google index is "interfering both with the access of its 50,000-plus members, and with the Library Site's ability to reach new members."  Indeed, "Google's de facto boycott of the Library Site injures American Buddha, its present and prospective members, and the Internet-using public at large." *Id*. (emph. added).  This lowered visibility is a matter of critical importance:  "This letter is sent with the greatest urgency, as the damages being suffered by the Library Site and American Buddha are severe and continuing."  *Id*.  American Buddha's urgent concern that its 50,000-plus members, "prospective members,' and "the Internet-using public at large" enjoy continued access to its site, and that it continue to "reach new members"; its claim to suffer "severe damages" when its Internet visibility is lowered; and its express threat to sue Google Inc. if its demands are not met, are not the concerns of a "purely local" operation with "passive" websites.

American Buddha's commercial publishing activities are also the opposite of local.  At the time of American Buddha's initial motion to dismiss, American Buddha was listed as the publisher (and Charles Carreon and/or Tara Carreon the authors) of numerous literary works sold in Kindle e-book format on Amazon.com.  *See* Kjellberg Decl. ¶¶ 23-28, Exhs. 22-24.  Each of the American Buddha Kindle e-books sold nationally and internationally on Amazon.com has an "Amazon.com Bestsellers  Rank" that indicates that sales have  been  made.  *See id*.  American Buddha's readily available Kindle e-books directly contradict its conclusory declaration that it

has sold no products anywhere in the world, and specifically has never sold any products in the State of New York.  American Buddha has no sources of revenue whatsoever, via intrastate commerce in Arizona, via interstate commerce in the United States, or via international commerce worldwide.  American Buddha has not purposefully directed any

13

> of its activities, including the AB Websites, at the residents of New York, or in any way sought to avail itself of the privilege of doing business there. … American Buddha does not make money from the Internet or from any other source.

Tara Carreon Decl. ¶¶ 10-11.  In addition, the Naderlibrary.com site links users to a site called Sex.comchronicles.com, where Mr. Carreon's book *The Sex.Com Chronicles: A White-Hat Lawyer's Journey to the Dark Side of the Internet* is available for sale as a "High-quality Softcover from Amazon" and in a variety of digital formats.  *See* Kjellberg Decl. ¶¶ 12-14, Exhs. 12-15.  *The Sex.Com Chronicles* is not, however, available for FREE, FREE, FREE reading and downloading on the AB Websites, as are the pirated books of Penguin and other authors and publishers. [6]

Thus, a cursory review of the Naderlibrary.com and American-Buddha.com websites, as well as Amazon.com, reveals activities on American Buddha's part that are far beyond merely "local in character," and that American Buddha derives substantial revenue from interstate and

---

[6] Judge Lynch, in granting American Buddha's first motion to dismiss, noted that Penguin "also discusses various activities of Charles Carreon," and held such activities to be irrelevant "[a]bsent any allegation that Carreon is an alter ego of American Buddha."  *Am. Buddha*, 2009 U.S. Dist. LEXIS 34032 at *2 n.1.  It is as clear as it can be, at the present stage, that Mr. Carreon is not merely American Buddha's "legal representative."  He is one of American Buddha's incorporators (along with Tara Lyn Carreon and Ana Belinda Carreon), and its contact person.  Mr. Carreon's law practice, Online Media Law, PLLC, has the same principal place of business, 2165 S. Avenida Planeta, Tucson, Arizona, the principal place of business of American Buddha, and the listed address for 1 Prime Publishing, publisher of Charles Carreon's *Sex.Com Chronicles* and numerous Kindle e-books available for paid download on Amazon.com.  American Buddha is the publisher of a number of Mr. Carreon's other literary works, also available for paid download on Amazon.com in Kindle e-book editions.  See Kjellberg Decl. ¶¶ 26-28.

The Naderlibrary.com site also contains a link ("Legal Representation for American Buddha provided by Online Media Law, PLLC") redirecting users to Charlescarreon.com, devoted to his law practice, Mr. Carreon's law practice, Online Media Law, PLLC.  There Mr. Carreon solicits clients who have "California or Federal law issue(s)."  Potential clients are advised, "I always require payment of a retainer in an appropriate amount before I take on a client, and don't take cases on contingency, or for startup equity.  I will always send you a written agreement for signature, and representation begins when I have the signed agreement in hand and payment in my account."  Visa and Mastercard logos on the Charlescarreon.com home page indicate that payment may be made by credit card.  *See* www.charlescarreon.net/services.

14

international commerce.  In *Cello Holdings, L.L.C. v. Lawrence-Dahl Cos.*, 89 F. Supp. 2d 464

(S.D.N.Y. 2000), the court found—*after* jurisdictional discovery had been allowed—that,

"although the record is less clear in this respect, … [defendant] 'derives substantial revenue from

interstate or international commerce.'"  The defendant, the court found,

> had a website offering domain names for sale and he in fact sold two domain names.  He
> has also sold equipment to customers in New York (albeit after the filing of this lawsuit).
> Although he was somewhat evasive at his deposition, the only source of income that he
> identified was his "current business." …  He described his current business, Audio
> Online, as a company that "seeks to promote sales internationally through the internet."

89 F. Supp. 2d at 470.  However modest American Buddha may claim its revenues to be, they

are at least consistent with the revenues found to be "substantial" in *Cello Holdings*.

Moreover, the modesty, or even absence, of a defendant's revenues cannot be dispositive

under "an analysis of the totality of the circumstances," *ADP Investor Commun. Servs. v. In

House Atty. Servs.*, 390 F. Supp. 2d 212, 220 (E.D.N.Y. 2005), in a case such as this one, in

which the defendant gives away, rather than sells, infringing copies of the plaintiff's works, at no

cost to the defendant.

In any case, "dismissal for lack of personal jurisdiction is inappropriate under

302(a)(3)(ii) even where there is no proof that a defendant derives substantial revenue from

interstate or international commerce, where that knowledge is peculiarly under the control of [the

defendant], and may come to light in the course of [s]ubsequent discovery."  *Energy Brands*, 571

F. Supp. 2d at 468 (alterations in original) (quoting *Kroger Co.,* 2006 U.S. Dist. LEXIS 90393 at

*10); *see Prentice v. Demag Material Handling, Ltd.*, 80 A.D.2d 741, 742, 437 N.Y.S.2d 173

(4th Dep't 1981) (denial of motion to dismiss was proper where defendant "is in sole possession

of information that may refute the allegation that it engages in substantial international trade").

***

Penguin has established all of the elements of a *prima facie* case of personal jurisdiction

under CPLR § 302(a)(3)(ii).  This Court may properly exercise jurisdiction over American

Buddha pursuant to the New York long-arm statute.

## II. THIS COURT'S EXERCISE OF JURISDICTION WILL NOT VIOLATE AMERICAN BUDDHA'S DUE PROCESS RIGHTS

Jurisdiction over American Buddha also comports with the constitutional requirement of due process. The due process test for personal jurisdiction has two parts: the "minimum contacts" inquiry and the "reasonableness" inquiry. *Mario Valente Collezioni, Ltd. v. Confezioni Semeraro Paolo, S.R.L.*, 264 F.3d 32, 37-38 (2d Cir. 2001).

### A. The Minimum Contacts Requirement is Met by American Buddha's Intentional Conduct, Which Was Expressly Aimed at and Caused Harm to Penguin in New York

The minimum contacts requirement is met "if the defendant has 'purposefully directed' his activities at the residents of the forum"; *i.e.*, there has been "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985). The court should consider the relationship among the defendant, the forum, and the litigation. *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984). In determining the issue, the court first asks whether the defendant has acted in such a way that it could reasonably expect to be haled into court in the forum. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). This "fair warning" requirement is met when a defendant has purposefully directed its activities at persons in the forum, and the suit arises from the injurious consequences of those activities. *Burger King*, 471 U.S. at 472.

Under the "effects test" enunciated by the Supreme Court in *Calder v. Jones*, 465 U.S. 783, 789-90 (1984), intentional misconduct, as opposed to "mere untargeted negligence," causing an effect in the forum state will establish personal jurisdiction over an out-of-forum defendant, consistent with due process, where the injuries that are the subject of the litigation arise from or relate to defendant's subject conduct. The *Calder* Court, reasoning that "[a]n individual injured in California need not go to Florida to seek redress from persons who, though

16

remaining in Florida, knowingly cause the injury in California," 465 U.S. at 812-13, held "that jurisdiction over petitioners in California is proper because of their intentional conduct in Florida calculated to cause injury to respondent in California," *id*. at 791.  "[T]here can be no serious doubt after *Calder v. Jones* … that the state in which the victim of a tort suffers the injury may entertain a suit against the accused tortfeasor."  *Janmark Inc. v. Reidy*, 132 F.3d 1200, 1202 (7th Cir. 1997).  In *Simon v. Philip Morris, Inc.*, 86 F. Supp.2d 95 (E.D.N.Y. 2000), the court noted that

> The main point of the [*Calder*] case is its distinction between intentional and negligent wrongdoing for purposes of assessing minimum contacts.  Where intentional misconduct is at issue, the wrongdoer should reasonably anticipate being called to answer for its conduct wherever the results of that conduct are felt.

*Id*. at 132.  The willful copyright infringement for which Penguin seeks relief, *see* Complaint, ¶1 is just such intentional misconduct.  *See, e.g., Isbell v. DM Records, Inc.*, 2004 U.S. Dist. LEXIS 10394, *35 (N.D. Tex. June 4, 2004) ("The *Calder* 'effects' test applies to intentional business torts, including copyright infringement.").

American Buddha is "not charged with mere untargeted negligence," and its conduct is not "random" or "fortuitous."  *Calder*, 465 U.S. at 789; *Burger King*, 471 U.S. at 475.  There is no question that American Buddha acted intentionally when it copied Penguin's books and uploaded the copies to the AB Websites for unrestricted viewing and downloading, or that "the crux of Penguin's copyright infringement claim … is the <u>intended consequence</u> of those activities—the instantaneous availability of those copyrighted works on American Buddha's Web sites for anyone, in New York or elsewhere, with an Internet connection to read  and download the books free of charge."  *American Buddha*, 16 N.Y.3d at 304-05 (emph. added).

Courts applying the *Calder* "effects test" have held that willful copyright infringement is sufficient in and of itself to meet the purposeful availment requirement.  *See, e.g., Columbia Pictures Television v. Krypton Broad. of Birmingham, Inc.*, 106 F.3d 284, 289 (9th Cir. 1997)

("Columbia alleged, and the district court found, that Feltner willfully infringed copyrights owned by Columbia, which, as Feltner knew, had its principal place of business in the Central District.  This fact alone is sufficient to satisfy the 'purposeful availment' requirement."), *overruled on other grounds*, 523 U.S. 340 (1998); *Real Good Toys v. XL Machine Ltd.*, 163 F. Supp. 2d 421, 424-25 (D. Vt. 2001) ("Where, as alleged here, XL and Bernstein have knowingly and willfully infringed upon the copyright and trade dress of a Vermont corporation, knowing that the 'brunt of the injury' would be sustained in Vermont, *Calder*'s 'effects test' has been met, at least preliminarily."); *Righthaven, LLC v. Mostofi*, 2011 U.S. Dist. LEXIS 35950 *5-6 (D. Nev. Mar. 22, 2011); *Panavision Intern., L.P. v. Toeppen*, 141 F.3d 1316, 1321 (9th Cir. 1998) (holding that the *Calder* "effects" test was satisfied in a trademark case, as defendant knew that plaintiff would suffer harm in California, since "its principal place of business was in California, and the heart of the theatrical motion picture and television industry is located there").

Recently, in *J. McIntyre Machinery, Ltd. v. Nicastro*, 131 S. Ct. 2780 (2011), a plurality of the Supreme Court held that "[a]s a general rule, the exercise of judicial power is not lawful unless the defendant 'purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'"  *Id*. at 2789 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).  Therefore, "the principal inquiry … is whether the defendant's activities manifest an intention to submit to the power of a sovereign."  *Id*. at 2788.[7]  Justice Breyer, joined by Justice Alito, concurred in the judgment, but would resolve the case simply by adhering to the Court's precedents, and "would not go further."  Because the case "does not implicate modern concerns," it is "unwise to announce a rule of broad applicability

---

[7] "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of [the majority], the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds."  *Marks v. United States*, 430 U.S. 188, 193 (1977).

without full consideration of the modern-day consequences." 131 S. Ct. at 2791. What, for

example, do the plurality's standards mean

> when a company targets the world by selling products from its Web site? And does it
> matter if, instead of shipping the products directly, a company consigns the products
> through an intermediary (say, Amazon.com) who then receives and fulfills the orders?
> And what if the company markets its products through popup advertisements that it
> knows will be viewed in a forum? Those issues have serious commercial consequences
> but are totally absent in this case.

*Id*. at 2793. Here, of course, "the Internet, which by its nature is intangible and ubiquitous," 16

N.Y.3d at 304, is not only present but central; "targeting" and "purposeful availment" must be

evaluated in this new context. It is American Buddha's choice to conduct its business over the

Internet, and it cannot insulate itself from the Internet's inevitable consequences. Mr. Carreon's

characterization of this litigation as "present[ing] important issues of intellectual property law,"

Declaration of Charles Carreon (Dkt. No. 31), ¶ 2, underscores that American Buddha's fair use

and library-privilege defenses, however specious, are part of its purposeful action in support of

its business model of making copyrighted works of others available to the "Internet-using public

at large," which includes New York, where American Buddha knows that authors and publishers

will be injured.

The *Nicastro* plurality itself indicates that its requirement that "the defendant's activities

manifest an intention to submit to the power of a sovereign" applies only in the context of

traditional commercial tort cases such as the product-liability case before the Court, in which

"the so-called 'stream-of-commerce' doctrine cannot displace" it. 131 S. Ct. at 2785. *Nicastro*'s

jurisdictional concern with the "stream of commerce" doctrine has no relevance to American

Buddha, which displays and distributes its pirated e-books direct from its own websites, and not

through an intermediary or national distributor. As the plurality states, "there may be exceptions,

say, for instance, in cases involving an intentional tort"; "with an intentional tort, the defendant

might well fall within the [forum's] authority by reason of his attempt to obstruct its laws." *Id*. at

19

2787.  *Nicastro*, in sum, neither diminishes nor detracts from the applicability of the *Calder*

"effects" test in a case such as this one, involving intentional actions that amount to online

copyright infringement.

      1.    **The Interactive AB Websites Support a Finding of Jurisdiction Over American Buddha**

      Purposeful activity without the state that would result in minimum contacts with the state

may "include the operation of an Internet website."  *Obabueki v. Int'l Bus. Machines Corp.*, 2001

WL 921172, at *2-3 (S.D.N.Y. Aug. 14, 2001).  The courts have identified a spectrum of cases

involving a defendant's use of the Internet:

> At one end are cases where the defendant makes information available on what is
> essentially a "passive" web site. … At the other end of the spectrum are cases in which
> the defendant clearly does business over the internet. … Occupying the middle ground
> are cases in which the defendant maintains an interactive web site which permits the
> exchange of information between users in another state and the defendant, which
> depending on the level and nature of the exchange may be a basis for jurisdiction.

*Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549, 565 (S.D.N.Y. 2000).  Websites such as

the AB Websites, "that permit information exchange between the defendant and viewers[,] are

deemed 'interactive,' and generally support a finding of personal  jurisdiction over the

defendant."  *Alpha Int'l  v. T-Repro's, Inc.*, 2003 U.S. Dist. LEXIS 11224 (S.D.N.Y. July 1,

2003); *Hsin Ten Enter. USA, Inc. v. Clark Enters.*, 138 F. Supp. 2d 449, 456 (S.D.N.Y. 2000)

(same).   The AB Websites do much more than passively post information.  American Buddha

directs users to read and "download" pirated e-books in their entirety, and promotes that reading

and downloading by misrepresenting that the user and the site are engaged in lawful activity

under the federal Copyright Act.  The AB Websites have used the "FREE" availability of

Penguin's books to actively solicit users to "join up" by way of a three-step "membership

process" requiring the user to submit personal identifying information and execute a click-wrap

agreement.  *See* Exh. 30.  In exchange, the user is granted "access to the content that originally

brought you here, and the rest of the ABOL archives"—including the pirated Penguin e-books.[8]

The click-wrap agreement, under which members agree not to "attempt to download more than one media file at a time," *see id.*, shows that actively "mak[ing] available … artistic and literary works," *see* Exh. 2,  for allegedly lawful FREE downloading by the general public, and not passively providing information, is the business of the "American Buddha Online Library" sites.  To the extent that American Buddha gives away FREE rather than sells access to and copies of Penguin's works, it does not diminish the commerciality of American Buddha's use of those works to attract traffic to its websites and to its own works, which it sells on Amazon.com. *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 562 (1985) ("The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price.").  Moreover, American Buddha has deliberately chosen as its business model the unlawful distribution and display of copyrighted works, instead of limiting its operation to public domain works.  Its business strategy was calculated to draw legal action by copyright owners in the nation's book publishing capital, New York, which it did.

As the court noted in *Sony BMG Music Entm't v. Tenenbaum*, 672 F. Supp. 2d 217 (D. Mass. 2009), a party's alleged lack of commercial purpose in no way diminishes its capacity to cause injury to copyright owners.  Indeed, FREE, FREE, FREE pirated e-books displayed and distributed over the internet are even *more* harmful than pirated product sold in the marketplace:

> Although the purpose of Tenenbaum's file sharing may not have been "commercial" in any classic sense, as noted above, from a consequential perspective the difference becomes harder to make out.  The Court sees little difference between selling these works in the public marketplace and making them available for free to the universe of peer-to-peer users.  *If anything, the latter activity is likely to distribute even more copies—and*

----

[8] The grant of access is strictly conceptual.  As noted, there are no technological restrictions at all on "the instantaneous availability of those copyrighted works on American Buddha's Web sites for anyone, in New York or elsewhere, with an Internet connection to read  and download the books free of charge."  *American Buddha*, 16 N.Y.3d at 304-05.

> *therefore result in a bigger market impact—because there is no cost barrier at all.  It is difficult to compete with a product offered for free.*

672 F. Supp. 2d at 231.  *See also Sony BMG Music Entm't v. Tenenbaum*, 721 F. Supp. 2d 85, 111 (D. Mass. 2010) ("Aside from being illegal, such conduct may reduce demand for music from legitimate sources and thus dampen the monetary incentive for artists to create new works.").

**B.      The Exercise of Jurisdiction Over American Buddha Is Reasonable**

The reasonableness requirement is met if the assertion of personal jurisdiction over the defendant comports with "traditional notions of fair play and substantial justice" under the circumstances of the particular case.  *Calder*, 465 U.S. at 788 (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).  Courts take into account five factors in the reasonableness inquiry:  (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies.  *See Burger King*, 471 U.S. at 477.

On the first factor, American Buddha has presented no evidence that defending against this litigation in New York would impose a burden so unreasonable that it would amount to a violation of its constitutional rights.  There is no suggestion that "this general burden presents any particular hardship to it."  *Starmedia Network, Inc.*, 2001 U.S. Dist. LEXIS 4870 at *13. American Buddha is represented *pro bono* by counsel who practices under the trade name Online Media Law, PLLC, and in fact, has been granted permission to participate by telephone in court conferences and court arguments.  It is unlikely, "in this modern age and for a litigant with obvious familiarity with internet communication, [that] litigation in New York would present so great an inconvenience as to constitute a deprivation of due process."  *Savage Universal*, 2004

22

U.S. Dist. LEXIS 16088, *35; *see Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 574 (2d Cir. 1996) ("the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago."); *Hollow v. Hollow*, 193 Misc. 2d 691, 696, 747 N.Y.S.2d 704 (Sup. Ct. Oswego County 2002) ("The federal courts are not required to turn a blind eye to society's embracement of such technological advances."). In any case, "this burden may be less onerous if one considers that [the defendant] could have and should have reasonably foreseen that its actions would have consequences in New York." *Whitaker v. Fresno Telsat, Inc.*, 87 F. Supp. 2d 227, 233 n.6 (S.D.N.Y. 1999).[9]

Second, "New York has a legitimate interest in insuring that corporations with substantial business operations in the state are given legal protection and in remedying tortious activities that occur within the state." *Mega Tech Int'l Corp. v. Al-Saghyir Establishment*, 1999 U.S. Dist. LEXIS 6381, *18-19 (S.D.N.Y. May 3, 1999). In particular, because so many intellectual property holders are located here, "New York has a substantial interest in protecting the intellectual property rights of copyright and trademark holders." *M. Shanken Comm'ns. Inc. v. Cigar 500.com*, 2008 U.S. Dist. LEXIS 51997 (S.D.N.Y. July 7, 2008); *see VideoEgg*, 2009 U.S. Dist. LEXIS 19557 at *32 ("this forum is home to numerous record companies forced to seek court intervention to deter online copyright infringement and thus has an interest in the adjudication of the issues raised by Plaintiffs' complaint."); Julie E. Cohen *et al.*, *Copyright in a Global Information Economy* 336 (2d ed. 2006) (the Second and Ninth Circuits "tend to be leaders in the copyright field given the presence of substantial publishing, entertainment, and

---

[9] The click-wrap agreement indicates that the media law- and e-commerce-savvy American Buddha does not view litigation in another state to be particularly burdensome for itself or its members. American Buddha requires Online Library members to "consent to the jurisdiction of the U.S. District Court for the District of Oregon for the resolution of any disputes concerning my use of the creative work." American Buddha thus requires that disputes over the copyrighted works that it unlawfully displays and distributes be adjudicated in a district 1,000 miles from its own home—and potentially even farther from the member's home district. *See* Exh. 30.

software companies in their jurisdictions").[10]

 Third, the interest of Penguin and others similarly situated in obtaining convenient and effective relief is clearly served by litigating in New York.  *See VideoEgg*, 2009 U.S. Dist. LEXIS 19557 at *33 ("the Plaintiffs' interest in convenient relief is served by litigating in this forum because many of them have New York as their principal place of business.").

 Fourth, the interstate judicial system's interest in efficient resolution of this dispute is served by adjudication in New York.  Witnesses and evidence are at least as likely to be located in New York as anywhere else, a primary consideration under the fourth factor.  *See Kernan* 175 F.3d at 245.  "From a judicial efficiency perspective, New York is as efficient as [any state] as a forum to resolve the controversy, because the bulk of the evidence concerns internet website printouts and federal court or agency records, which are accessible anywhere to parties with internet access (a group to which [defendant] plainly belongs)."  *Savage Universal*, 2004 U.S. Dist. LEXIS 16088 at *36.

 Fifth, no substantive social policy would be undermined by this Court's exercise of personal jurisdiction over American Buddha.  Indeed, this Court's resolution of the instant dispute *could* not "conflict with the fundamental substantive social policies" of another State or of the United States, "because Plaintiffs allege violations of federal copyright law."  *VideoEgg*, 2009 U.S. Dist. LEXIS 19557 at *33 (internal quotation marks omitted); *Savage Universal*, 2004

---

[10] As Justice Brennan wrote more than 30 years ago,

[T]he structure of our society has changed in many significant ways since *International Shoe* was decided in 1945. … modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity. … In answering the question whether or not it is fair and reasonable to allow a particular forum to hold a trial binding on a particular defendant, the interests of the forum State and other parties loom large in today's world and surely are entitled to as much weight as are the interests of the defendant.

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 307-311 (1980) (Brennan, J., dissenting) (emphasis added).

U.S. Dist. LEXIS 16088 at *36 ("litigating this case in New York presents no conflict with the sovereignty of Oregon, because it primarily concerns … a federal statute.").

Finally, "as a practical matter, the Due Process Clause permits the exercise of jurisdiction in a broader range of circumstances [than does] N.Y. C.P.L.R. § 302, and a foreign defendant meeting the standards of § 302 will satisfy the due process standard." *Energy Brands*, 571 F. Supp. at 469.  Accordingly, the Constitutional due process requirements for asserting personal jurisdiction over American Buddha are satisfied.

## CONCLUSION

For the reasons set forth above, Penguin respectfully requests that this Court deny American Buddha's motion to dismiss the complaint.

Dated: New York, N.Y.
           August 12, 2011

Respectfully submitted,

s/Richard Dannay
Richard Dannay (rxd@cll.com)
Thomas Kjellberg (txk@cll.com)
COWAN, LIEBOWITZ & LATMAN, P.C.
1133 Avenue of the Americas
New York, New York 10036-6799
(212) 790-9200
Attorneys for Plaintiff
Penguin Group (USA) Inc.

25