Charles Carreon (Cal. Bar # 127139)
Admitted *Pro Hac Vice*
2165 S. Avenida Planeta
Tucson, Arizona 85710
Tel: 520-841-0835
Fax: 503-296-5317
Email: chas@charlescarreon.com
Attorney for Defendant American Buddha

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

PENGUIN GROUP (USA) INC.,

        Plaintiff,

  -against-

AMERICAN BUDDHA*,*

        Defendant.

Case No. 09 CIV 00528 JGK

## NOTICE OF MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND REQUEST FOR LEAVE TO ATTEND HEARING TELEPHONICALLY

PLEASE TAKE NOTICE that upon the accompanying memorandum of law, on December 7, 2012 at 10:30 a.m., the undersigned attorney for Defendant American Buddha will move this Court before the Hon. Ronnie Abrams, at the United States Courthouse, 500 Pearl Street, New York, New York 10007, for an order pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure dismissing the claims against it.  Opposition papers shall be filed on or before October 30, 2012, and reply papers by November 13, 2012.  Defendant further requests leave for its counsel to attend the hearing scheduled for December 7, 2012 at 10:30 a.m. via telephone.

Dated:  October 1, 2012
Respectfully submitted:

/s/Charles Carreon

_____
Charles Carreon (California Bar # 127139)
Admitted *Pro Hac Vice*

Charles Carreon (Cal. Bar # 127139)
2165 S. Avenida Planeta
Tucson, Arizona 85710
Tel: 520-841-0835
Fax: 520-843-2083
Email: chas@charlescarreon.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PENGUIN GROUP (USA) INC.,

    Plaintiff,

-against-

AMERICAN BUDDHA,

    Defendant.

Case No. 09 CIV 00528

# MEMORANDUM IN SUPPORT OF AMERICAN BUDDHA'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

### 1. Procedural Background

American Buddha previously prevailed on its first motion to dismiss for lack of personal jurisdiction, when this action was pending before the Hon. Gerard E. Lynch, who has since been elevated to the Second Circuit. Penguin appealed, and after argument, the Second Circuit panel certified a question to the New York Court of Appeals, that it answered as follows:

> "Because the Internet plays a significant role in this case, we narrow and reformulate the certified question to read:
>
> > 'In copyright infringement cases involving the uploading of a copyrighted printed literary work onto the Internet, is the situs of injury for purposes of determining long-arm jurisdiction under N.Y. C.P.L.R. § 302 (a) (3) (ii) the location of the infringing action or the residence or location of the principal place of business of the copyright holder?'
>
> In answer to this reformulated question and under the circumstances of this case, we conclude it is the location of the copyright holder.
>
>         \* \* \*
>
> CPLR 302 (a)(3)(ii) incorporates built-in safeguards against such exposure by requiring a plaintiff to show that the nondomiciliary both 'expects or should reasonably expect the act to have consequences in the state' and, importantly,

'derives substantial revenue from interstate or international commerce.' There must also be proof that the out-of-state defendant has the requisite "minimum contacts" with the forum state and that the prospect of defending a suit here comports with "traditional notions of fair play and substantial justice," as required by the Federal Due Process Clause (*International Shoe Co. v Washington,* 326 US 310, 316 [1945] [internal quotation marks and citation omitted]; *see also World-Wide Volkswagen Corp. v Woodson,* 444 US 286, 291-292 [1980])."

*Penguin Group (USA) Inc. v. American Buddha,* 16 N.Y.3d 295, 301-302, 307 (2011).

The Second Circuit remanded the case to this Court with the following directions:

"We therefore vacate the judgment of the district court and remand this case to that court for its consideration in the first instance of whether Penguin has established the four remaining jurisdictional requisites, and the extent to which the assertion of personal jurisdiction over American Buddha would be consistent with the requirements of Due Process."

*Penguin Group (USA) Inc. v. American Buddha*, 640 F.3d 497, 501 (2nd Cir. 2011).

On remand, the case was reassigned to the Hon. John G. Koeltl, and American Buddha moved again for dismissal for lack of personal jurisdiction. Judge Koeltl held a hearing on January 24, 2012 to hear argument on the motion. Penguin opened its argument by pushing for an expanded definition of "revenue" under C.P.L.R. 302(a)(3)(ii), that it described as an "active interest."

Judge Koeltl responded to the argument by: (1) rejecting Penguin's "active interest" argument as an effort to interpolate new terms into the statute, (2) making it clear that he defines "revenue" as "money," and (3) admonishing Penguin's counsel that if American Buddha was not making money, "it is very hard to see that you meet the jurisdictional test."

> MR. DANNAY: I went . . . onto the Ralph Nader Library website and the American Buddha website. . . . I printed of all of the books that they offer for free. (Transcript, 3:1-10; Exhibit 1.)
>
> THE COURT: It doesn't help your case by saying that these four books as to which Penguin says it has the copyright are offered for free by American Buddha. They say they have no revenues. They say they don't fall within the provision of the New York long arm statute that you are relying on. More persuasive in your papers is your allegation that it's not right that they don't have revenues, because they do sell books. … That would appear to create a factual dispute as to which perhaps discovery is necessary to find

> out whether, when the defendant says they have no revenues, that is in fact correct. (Transcript, 4:8-17; 5:15-18.)
>
> MR. DANNAY: I think we also have to step back in terms of the substantial revenue from the interstate commerce requirement. The purpose of that requirement was that the defendant have an active interest in interstate commerce and that there not be jurisdiction over what is essentially just a business operation of a local character. That does not characterize American Buddha. American Buddha is not local. They have an active interest in interstate commerce…. (Transcript, 6:1-9.)
>
> THE COURT: The statute, of course, doesn't say active interest. The statute says revenues. I don't rewrite statutes. So, the question turns on revenues, not active interest. (Transcript, 6:1-16.)
>
> THE COURT: If there were such thing as a publisher who makes copies for free and hands them out or delivers them for free, putting aside for a moment how that is done, it would be difficult to see that that publisher derives substantial revenue from interstate or international commerce. You appear to be arguing that the statute may be outdated. That may be. But if the statute is outdated, the remedy is with the legislature, not with the Court. The Court just doesn't read out what the statute says. So, your policy arguments that the statute is outdated really don't help you very much with me. You can make those arguments to the legislature. I have to interpret the jurisdictional statute which has as a requirement "derives substantial revenue from interstate or international commerce." You argue in your papers that American Buddha does. They deny it. You asked for discovery on that issue. That's reasonable at this point. I give you a caution, I really do, and I'll give you a detailed explanation in a moment. If, as I am inclined to do, I order discovery in order to be able to find out the truth of the conflicting allegations, there may well be at the end of the day another motion to dismiss for lack of personal jurisdiction after the facts are determined. If discovery shows that American Buddha is right that they don't have any revenues -- that's what they say, no revenues -- if they are right, then it is very hard to see that you meet the jurisdictional test in the statute. The test doesn't go away simply because you tell me that we are in a new, digital world and we have to re-imagine the concept of jurisdiction. (Transcript, 8:1-18; 9:1-13.)

The Court then put the question to defendant's counsel to explain American Buddha's "strictly eleemosynary model."

> THE COURT: Explain to me for a moment how American Buddha operates on a strictly eleemosynary model so that despite the fact

that it is the alleged publisher of literary works that are listed for purchase on Amazon, no revenues ever come to American Buddha.

MR. CARREON: Your Honor, what I would do is show you that those activities, publishing on Amazon, the only writings that are there are what I myself have written. When I initially wrote many of them, for example, I specifically remember The Revolution Will Not Be Capitalized, a biography of Che Guevara, and when it was first written I was also the publisher of a newspaper called the Ashland Free Press in Ashland, Oregon. I published it on paper in the Ashland Free Press and I allowed it to be sent to American Buddha for publication there for free. It appeared on the website for free. At the time when it occurred to me to put it on Amazon through the Kindle platform, where it is sold now for I believe 99 cents, I thought, well, it has appeared on American Buddha and they have a little thing in there on their digital publishing platform that gives a credit, and I put it on American Buddha. That was basically all there was to it. The revenue, what will be shown -- there is really no problem cutting and pasting the information from my bank records -- goes to my company, which is called Online Media Law LLC. It's very modest revenue. I think monthly it comes to $24. That's basically it.  [T]here is no financial benefit that comes to me from the manner in which American Buddha and Nader Library are operating. There is no corporate unit. There are no board members sitting on either board. American Buddha has no shares. It is a nonprofit corporation under the provisions of Oregon law. Ms. Carreon is a director, I am not. I never had any interest in it except the very initial incorporation, which I believe was in the year 2000 or 2001. I was the incorporator just for purposes working the papers up and transferred that over to her as soon as it was incorporated. It really does have no financial activity whatsoever. It is not intended for that purpose. It bears no resemblance to the piratical enterprises that are out there on the Internet.

THE COURT: Thank you, Mr. Carreon.

(Transcript, 17:19 - 20:18.)

2. **The Results of Jurisdictional Discovery**

*First,* Penguin issued a subpoena to Amazon in the form attached as Exhibit 2 to the Charles Carreon Declaration, that sought a wide range of documents, including "All documents concerning the following books sold or offered for sale by [Amazon]," followed by a list of the fifteen (15) titles that Penguin believed were been sold by American Buddha (the "Fifteen Titles").  (Exhibit 2, page 7, Request # 1.)  The subpoena also sought "All documents concerning

American Buddha, including but not limited to documents sufficient to show all moneys paid by you to American Buddha." (Exhibit 2, page 9, Request # 2.) Penguin's counsel forwarded the documents produced by Amazon to counsel for defendant. (Charles Carreon Dec. ¶ 4.) Those documents produced no evidence of any payments from Amazon to American Buddha. (Charles Carreon Dec. ¶ 4.)

*Second,* Penguin propounded interrogatories and document requests to American Buddha, seeking essentially the same information as it sought from Amazon. American Buddha's responses were, in essence, that all of the documents regarding money paid by Amazon for revenues from the sale of the Fifteen Titles were in the custody of Online Media Law, LLC, aka Online Media Law, PLLC ("OML"). After some negotiation between counsel and a brief discovery conference with Judge Koeltl, OML agreed to accept service of a subpoena pursuant to a confidentiality order signed by Judge Koeltl, and OML produced responsive documents and a witness for deposition. Of those documents, the most salient were the IRS form 1099's for 2008 – 2010, issued by Amazon to OML, attached as Exhibit 3 to the Charles Carreon Declaration, that record all of the revenue Amazon and its Print on Demand subsidiary paid OML for sales of the Fifteen Titles for three recent years. (Charles Carreon Dec. ¶ 5.) OML produced evidence that the contracts with Amazon for sale of the Fifteen Titles were all entered into by OML and not by American Buddha. (Charles Carreon Dec. ¶ 5.) OML produced documents that revealed the internal operation of the Amazon Kindle Digital Publishing platform (the "KDP website"). (Charles Carreon Dec. ¶ 7 and Exhibit 4.) OML testified that the only other publishing contract pertaining to one of the Fifteen Titles, the book "Trail of the Octopus" authored by Lester Coleman, was executed by Charles Carreon in his capacity as the manager of 1 Prime Publishing, LLC, a wholly-owned subsidiary of OML. (Charles Carreon Dec. ¶ 9; Exhibit 6.) Finally, OML's designated witness Charles Carreon testified, consistent with his above-quoted statement to Judge Koeltl at oral argument, that OML's designation of American Buddha as "publisher" of some of the Fifteen Titles was (a) merely a respectful acknowledgement that some of the titles had already been published online at American-

Buddha.com, and (b) not indicative of any payment of money to American Buddha, because no such payment was ever made. (Charles Carreon Dec. ¶ 7; Exhibit 5.)

*Third,* Penguin took the deposition of American Buddha's sole Director, Tara Carreon, that confirmed that American Buddha has no bank account, and has never received any revenue from publication of any of the Fifteen Titles.

In summary, jurisdictional discovery confirmed American Buddha's representations to the Court that it has no revenue.

### 3. Facts Supporting Plaintiff's Motion

American Buddha moves for dismissal on the grounds that Penguin cannot carry its burden of establishing necessary jurisdictional facts under the "foreseeability" and "substantial revenue" prongs of Subsection (ii) of C.P.L.R. § 302(a)(2), and further, that the exercise of jurisdiction would not comport with traditional notions of fair play and substantial justice required under the Fourteenth Amendment of the United States Constitution, as established in *International Shoe Co. v. Washington,* 326 U.S. 310 (1945) and its progeny.

American Buddha is an Oregon nonprofit corporation whose President and sole volunteer worker lives in Tucson, Arizona. (Carreon Dec. ¶¶ 1, 4, 5, and 7.) Penguin alleges copyright infringement based on content appearing on American Buddha's passive website, www.naderlibrary.com, that is not directed at or targeted to New York residents. (Complaint ¶ 9; Tara Carreon Dec. ¶ 9.) In the course of argument and appeal, Penguin has expanded the scope of argument to include the activity of a second website operated by American Buddha, to wit, www.american-buddha.com. Accordingly, since the same analysis applies to the operation of both sites, the two websites are referred to jointly herein as the "AB Websites."

American Buddha is operated by one person, Tara Lyn Carreon, the President of the corporation, and the company has no agents acting on its behalf. (Tara Carreon Dec. ¶¶ 1 and 4.) American Buddha has caused no effect in New York. (Tara Carreon Dec. ¶ 15.) American Buddha neither expects nor should it reasonably expect the AB Websites to have consequences in New York. (Tara Carreon Dec. ¶¶ 15 - 19.) American Buddha has no real estate, personal

property, or bank accounts anywhere in the United States or in any other nation.  (Tara Carreon Dec. ¶ 9.)  American Buddha does not sell any product, nor does it sell advertising, anywhere in the world.  (Tara Carreon Dec. ¶ 9.)  The AB Websites provide a unique resource for scholars and students, by providing access to a contained, searchable database of written works spanning centuries.  (Tara Carreon Dec. ¶ 12.)

Repeatedly throughout this litigation, Penguin has contended that the AB Websites allows Internet users to "download" the four Penguin works named in the complaint; however, this is a distortion of the facts.  Applying the ordinary meaning of the term "download," *the AB Websites make "downloadable files" available only for documents that are not subject to copyright*, like government documents that are in the public domain.  (Tara Carreon Dec. ¶¶ 17-18; Exhibit 10.)  *The AB Websites do not make downloadable files of copyrighted works available, providing only that type of access to copyrighted works that is necessary to enable scholarly use of those works.*  (Tara Carreon Dec. ¶ 19.)  American Buddha derives no revenue whatsoever from interstate or international commerce, and has never attempted to avail itself of the privilege of conducting business in New York.  (Tara Carreon Dec. ¶ 9.)  Such non-commercial activity does not provide evidence of conduct foreseeably giving rise to jurisdiction, *i.e.,* evidence of purposeful availments.  *See* Section 5.d, *infra*.

4. **The Standard For The Motions**

When a defendant moves to dismiss for lack of personal jurisdiction under F.R.Civ.P. 12(b)(2), plaintiff bears the burden of establishing grounds for jurisdiction.  *In re Magnetic Audiotape Antitrust Litigation,* 334 F.3d 204, 206 (2nd Cir. 2003).

5. **Analysis Under C.P.L.R. § 302(a)(3)(ii)**

C.P.L.R. § 302(a)(3)(ii) (herein "Subsection (ii)") has two analytical prongs, requiring this Court to determine *both* whether American Buddha derives substantial revenue from interstate or international commerce (the "revenue prong"), *and* whether American Buddha expected or reasonably performed any act that it should reasonably have expected to have jurisdictional consequences in New York (the "foreseeability prong").  In this case, Penguin is unable to carry its burden under *either prong* because American Buddha is non-commercial.

Penguin cannot carry its burden on the revenue prong, that assesses the defendant's economic size and strength, because American Buddha does not engage in commercial activity and therefore has no revenue.

Penguin cannot carry its burden on the foreseeability prong, because *only commercial activity* foreseeably generates jurisdictional contacts.  Since American Buddha markets no products and generates no revenues, whatever its activity, as a matter of law, it cannot generate jurisdictional contacts.[1]

Both the revenue and foreseeability prongs should be interpreted with attention to the New York Legislature's policy to avoid unfairness to nondomiciliaries: "The longarm statute's concern is that small, local companies who could not anticipate litigation in foreign forums not be exposed to suit in foreign forums." *Markham v. Gray,* 393 F.Supp. 163, 166 (W.D.N.Y.1975).

### a. "Doing the Numbers" on the Revenue Prong of Subsection (ii) Produces a Null Result, Because American Buddha Has No Revenue From Interstate or International Commerce

The revenue prong of Subsection (ii) is "***indispensable***."  *Ingraham v. Carroll,* 90 N.Y.2d 592, 598-599 (1997).  As Judge Koeltl made clear applying it is simply a matter of "doing the numbers."  A decision from the Western District explains:

> "***Simply put, the second prong is a 'bigness requirement', the purpose of which is to ensure that the defendant is "economically big enough to defend suit in New York."***
>
> *Roberts-Gordon, LLC v. Superior Radiant Products,* 85 F.Supp.2d 202, (WDNY 2000) (citations omitted).

American Buddha is a corporation with no economic "bigness" whatsoever.  American Buddha's Director and sole volunteer employee so avers in support of this motion.  (Tara Carreon Dec. ¶¶ 9 - 10.)  Discovery from three witnesses has confirmed that in fact, as Judge Koeltl intimated might be the case, American Buddha operates on a "strictly eleemosynary model." Amazon's response to Penguin's subpoena produced no evidence of payments to

---

[1] See discussion at Section 5.d, page 12, *infra*.

American Buddha.  (Charles Carreon Dec. ¶ 4.)  OML produced documents showing that Amazon for sales of the Fifteen Titles, and repeatedly testified that American Buddha was not the "publisher" because it did not sign the KDP agreement with Amazon, did not sign the contract with author Les Coleman to publish *Trail of the Octopus*, and did not receive any revenue from any of the Fifteen Titles.  (Charles Carreon Dec. ¶ 5; Exhibits 3 and 5.)

*Ronar, Inc. v. Wallace,* 649 F.Supp. 310 (SDNY 1986), is an often-quoted case from this District that summarized case law on how to determine whether a foreign defendant has "substantial revenue" from interstate or international commerce under the second prong:

> "Whether revenue is 'substantial' under New York law is determined on both relative and absolute scales. New York courts have analyzed defendants' revenues from interstate or international commerce as percentages of their total revenues. More recent cases have turned to the amount of interstate or international revenues as an absolute number for a more appropriate measure. Neither approach is binding on the court, as 'each case must be decided on its own facts.' [Multiple citations omitted.]"
>
> *Ronar, Inc. supra,* 649 F.Supp. at 316-317.

On either a relative or absolute scale, doing the numbers on the revenue prong produces a null result.  American Buddha has no revenue from any source. (Carreon Dec. ¶ 9.)   American Buddha's revenues from interstate or international commerce total zero dollars ($0.00), and its total revenue is also zero dollars ($0.00).  Thus, the percentage of total revenue derived from interstate or international commerce is zero, which is the same number produced by analyzing its revenues as an "absolute number."

Accordingly, the sole factual issue that warranted jurisdictional discovery has been resolved favorably to American Buddha.  It is now clear beyond dispute that Penguin cannot carry its burden of showing that American Buddha has substantial revenue from interstate or international commerce under the revenue prong of Subsection (ii).

**b. OML Has No Net Revenue From The Fifteen Titles, And Even The Gross Revenue Is Not Substantial, On Either a Relative or Absolute Scale**

In 2008, Amazon paid OML $38.74 for Kindle publication royalties on the Fifteen Titles. (Charles Carreon Dec. ¶ 6; Exhibit 3.)  In 2009, Amazon paid OML $689.96 in royalties on all the Fifteen Titles, comprised of $219.99 for Kindle publications, and $470 for paperbacks

published on demand by an Amazon subsidiary.  (Charles Carreon Dec. ¶ 6; Exhibit 3.)  In 2010, Amazon paid OML $681.04 in royalties on all the Fifteen Titles, $315.88 for Kindle, and $365.16 for paperbacks.  (Charles Carreon Dec. ¶ 6; Exhibit 3.)  These payments, totaling $1,409.74, and spread out over the intervening 36 months, amount to an average of $39.16 per month, or $1.30 per day.  It is clear that even the gross royalty payments flowing from the Fifteen Titles do not amount to substantial revenue.  Nor are these amounts substantial in a relative sense, as a proportion of OML's gross revenue.  (Charles Carreon Dec. ¶ 6.)

OML has netted no revenue, because it is not even in the black on the Fifteen Titles.  The cost of publishing and promoting just one of them, *Trail of the Octopus*, exceeded the aggregate of all royalties paid on all Fifteen Titles in 2008 - 2010.  (Charles Carreon Dec. ¶ 11; Exhibit 7.)

    c.  **OML's Economic Activities Do Not Generate Jurisdictional Contacts for American Buddha**

        i.  **OML Revenue Cannot Be Imputed to American Buddha**

There is no authority that would impute revenue paid to OML, a separate corporation that is neither a subsidiary nor corporate sibling of American Buddha, to American Buddha.  Judge Lynch dismissed Penguin's effort to conflate the actions of defendant and its counsel:

> "Absent any allegation that Carreon is an alter ego of American Buddha, *what Carreon does independent of defendant is irrelevant to whether this Court has jurisdiction over American Buddha*."

(Opinion and Order, Docket # 17, page 2, note 1, emphasis added.)

        ii.  **Hyperlinks Twice-Removed From A Potential Commercial Transaction That Might Generate Revenue for OML Cannot Generate Jurisdictional Contacts for American Buddha**

American Buddha here anticipates an argument Penguin may make: *that, if there is a hyperlink* on an AB Website that leads to OnlineMediaLaw.com,[2] where a digital advertisement, if clicked, takes the Internet user to Sex.Comchronicles.com, where a hyperlink can be clicked that takes the user to Amazon.com, where a copy of The Sex.Com Chronicles can be purchased thus generating a sale for Amazon and a royalty payment OML – *that this* amounts to a

---

[2] OnlineMediaLaw.com is a website where American Buddha's counsel has posted a free e-book entitled *Charles' Primer of Online Media Law*, and the website, of course, has hyperlinks back to charlescarreon.com and sex.comchronicles.com.

jurisdictional contact. The last five pages of the Tara Carreon deposition transcript are a series of "please click the iPad" directives, devoted to demonstrating that such a series of hyperlinks could be navigated by a hypothetical Internet user. (Charles Carreon Dec. ¶ 12; Exhibit 8.) Any argument based on this hypothetical would be Penguin's final attempt to distract the Court from a straightforward application of Subsection (ii) by dragging a red herring across the trail.

*First*, a hyperlink from a client's non-commercial website to its attorney's website does not convert the client's website into a commercial website.

> "*Bosley* also points out that Kremer's site contained a link to Public Citizen, the public interest group representing Kremer throughout this litigation. We hold that Kremer's identification of his lawyers and his provision of a link to same did not transform his noncommercial site into a commercial one."
> *Bosley Med. Inst., Inc. v. Kremer,* 403 F.3d 672, 678 (9th Cir. 2005).

*Second*, attenuated Internet connections to commercial sites will not turn a non-commercial website into a commercial website. "Kremer's website … contains links to a discussion group, which in turn contains advertising. This roundabout path to the advertising of others is too attenuated to render Kremer's site commercial." *Bosley,* 403 F.3d at 677. Put simply – since American Buddha does not engage in commerce, and does not direct its users to engage in commerce, Internet hyperlinks on its website generate no jurisdictional contacts. As Judge Koeltl put it:

> "The test doesn't go away simply because you tell me that we are in a new, digital world and we have to reimagine the concept of jurisdiction. Take it to the legislature. Follow?"
> (Transcript, 9:10-13.)

### d. American Buddha's Non-Commercial Activity Cannot, As A Matter of Law, Cause A Jurisdictional Effect In New York, Because Only Commercial Acts Cause Jurisdictional Effects

Penguin is bound by the finding on appeal that "Penguin does not specifically allege the loss of customers or other direct harm in New York…." *Penguin Group (USA) Inc. v. American Buddha,* 609 F.3d 30, 41 (2nd Cir. 2010).[3] Thus, Penguin's sole basis for asserting personal

---

[3] Since Penguin has prevailed on appeal on a record establishing that it has no lost customers, it is judicially estopped from taking a contrary position. *Bates v. Long Island R.R., Co.,* 997 F.2d 1028, 1037-38 (2nd Cir. 1993); *accord, Simon v. Safelite Glass Corp.,* 128 F.3d 68, 71 (1997).

jurisdiction over American Buddha is the purported commission of an act outside of New York that American Buddha "expects or should reasonably expect … to have consequences in the state." *Hamilton v. Accu-Tek,* 32 F.Supp.2d 47, 56 (EDNY 1998), *quoting Ingraham v. Carroll,* 90 N.Y.2d 592, 598, 665 N.Y.S.2d 10, 12, 687 N.E.2d 1293 (1997).

This "foreseeability requirement" is imposed by the Legislature "to ensure some link between a defendant and New York State to make it reasonable to require a defendant to come to New York to answer for tortious conduct committed elsewhere…." *Hamilton v. Accu-Tek,* at *id.*

> "New York cases addressing the foreseeability requirement after the Supreme Court's decision in *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980) have looked to that case, often integrating the 'reasonable anticipation of suit' analysis of *World-Wide Volkswagen* with the foreseeability requirements of C.P.L.R. § 302."

Thus, "After *Asahi,*[4] it is clear that ***foreseeability requires an affirmative or purposeful act invoking the benefits or protections of New York law,*** see *id.*, or, in other words, there must be evidence of '*a discernable effort to directly or indirectly serve the New York market.*'" *Hamilton v. Accu-Tek,* 32 F.Supp.2d at 56, *quoting Schaadt v. T.W. Kutter, Inc.,* 169 A.D.2d 969, 970, 564 N.Y.S.2d 865, 866 (3d Dep't 1991).

The declaration of American Buddha's librarian-director makes it clear that American Buddha does not reach out to any "market," since it has nothing to sell, and has never made a "discernable effort to directly or indirectly serve the New York market." (Carreon Dec. ¶ 9.)

6. **The Exercise of Jurisdiction Over American Buddha Would Violate the Fourteenth Amendment and Traditional Notions of Fair Play And Substantial Justice**

The due process clause of the Fourteenth Amendment provides:

> "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; ***nor shall any State deprive any person of life, liberty, or property, without due process of law***; nor deny to any person within its jurisdiction the equal protection of the laws."

Since the United States Supreme Court's decision in *International Shoe Co. v. Washington,* 326 U. S. 310 (1945), it has been hornbook law that the power of the courts to

---

[4] *Asahi Metal Indus. v. Superior Ct. of Cal.*, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987).

render valid judgments upon the residents of other states is limited by the due process clause of the Fourteenth Amendment. *International Shoe* held that compliance with due process requires states to exercise jurisdiction only over defendants who "have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Wash.,* 326 U.S. at 316.

### a. American Buddha Has Not Purposefully Availed Itself of the Privilege of Doing Business in New York

Minimum contacts analysis has evolved to "purposeful availments" analysis, as announced in *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, (1980):

> "When a corporation 'purposefully avails itself of the privilege of conducting activities within the forum State,' [citation] it has clear notice that it is subject to suit there…. But the mere 'unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State.'"
>
> *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. at 297 – 298, *quoting Hanson v. Denckla,* 357 U.S. 235, 253 (1958).

In *Kernan v. Kurz-Hastings, Inc.,* 175 F.3d 236 (2nd Cir. 1999), the Second Circuit affirmed dismissal of a product liability case against a Japanese power-press manufacturer that admitted selling a machine in New York that injured a New Yorker resident, holding that *World-Wide Volkswagen* precluded exercising jurisdiction over a defendant that had never directed commercial solicitations to the market in the forum state:

> "In *World-Wide Volkswagen,* the … Supreme Court found jurisdiction improper because ***there was no evidence in the record that petitioners had attempted 'to serve***, directly or indirectly, ***the market for its product***' in the forum state."
>
> *Kernan v. Kurz-Hastings, Inc.,* 175 F.3d at 243 (emphasis added).

Application of the same principle requires that the case at bar be dismissed. American Buddha has not purposefully directed any of its activities at the residents of New York, or in any way sought to avail itself of the privilege of doing business there. (Tara Carreon Dec. ¶ 9.) There is no evidence that American Buddha has any product to sell, or attempts to serve any market, much less the New York market. There is no evidence that American Buddha makes sales or generates revenues, or that the AB Websites solicited New Yorkers to enter into any

commercial transaction whatsoever; accordingly, it has not engaged in "purposeful availment" of the New York market, and cannot be subjected to New York's jurisdiction.

> **b. An "Estimate of the Inconveniences" Occasioned by a New York City Trial Establishes That Exercising Jurisdiction Over American Buddha Would Offend Traditional Notions of Fair Play and Substantial Justice**

In determining whether it is "reasonable, in the context of our federal system of government, to require the corporation to defend" a lawsuit in a distant forum, the Court may make an "estimate of the inconveniences" that would "result to the corporation from a trial away from its 'home' or principal place of business." *Int'l Shoe Co. v. Wash.,* 326 U.S. 310, 316-317 (U.S. 1945).

A trial of the issues to be posed by this case would require presentation of at least two lay witnesses for the defendant, one of whom lives in Arizona, and the other in Oregon. (Charles Carreon Dec. ¶ 13.) At least two expert witnesses will be required to establish (a) the true facts of what usage the AB Websites actually have, and (b) the legitimacy of digital libraries of books and their entitlement to the same exemption from copyright liability as paper libraries. For pro bono counsel to assume the entire cost of presenting the defense would be a substantial challenge in any venue; however, to put on the defense in New York City, with all of the attendant travel and lodging costs, would severely impair the quality of the defense, prejudice the outcome, and impose severe hardship on both attorney and client. (Charles Carreon Dec. ¶ 13; Tara Carreon Dec. ¶ 20.)

The decision of the issues presented by this case would be of first impression and of considerable significance to the public, because the interplay of the copyright laws and the First Amendment over questions of fair use implicates the public's rights of free expression and free access to the fruits of intellectual and creative scholarship over which the publishing industry asserts limited monopolies granted for the purpose of promoting the development of the arts and sciences. *Eg., Eldred v. Ashcroft,* 537 U.S. 186 (2003) (citing 17 U.S.C. § 107 fair use and other "built-in First Amendment accommodations" in upholding extension of copyright term as constitutional).

Judicial decisionmaking on issues of such moment should be informed by robust adversary exchanges built on a thorough factual record for decision, that articulates all of the best arguments for both sides.  To allow Penguin, the U.S. arm of an enormous multinational corporation with effectively unlimited attorney resources, to tilt the scales of justices further to its advantage by allowing it to litigate issues vital to the public interest against a nonprofit defendant made still weaker by being forced to defend in a distant forum, would be unfair to American Buddha.  Of equal importance, it would impair the fair litigation of an important legal issue that affects the public interest.  The final irony would be that this litigation in a foreign venue would occur despite Penguin's inability to allege even a single lost sale in New York, *i.e.,* nothing more than a theoretical injury to its publishing empire.  A more unfair situation for the defendant, and one less beneficial to the interests of justice, could hardly be imagined.

### 7. Conclusion

Penguin cannot carry its statutory and constitutional burden of establishing grounds for this Court to assert personal jurisdictional over the defendant.  The Court is respectfully requested to dismiss the action for lack of personal jurisdiction over American Buddha on the grounds that the non-commercial AB Websites generate no revenue and no foreseeable jurisdictional contacts in the State of New York; wherefore, American Buddha cannot be said to have purposefully availed itself of the privilege of doing business in New York, and it would offend notions of fair play and substantial justice to exercise jurisdiction over it.

Dated:  October 1, 2012
Respectfully submitted:

/s/Charles Carreon
_____

Charles Carreon,
Admitted *Pro Hac Vice*
Attorney for Defendant American Buddha